Ashley B. Jordan (SBN 313529)
E-mail: ajordan@reedsmith.com
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071-1514
Telephone No.: 213.457.8000
Fax No.: 213.457.8080

John N. Ellison (PA I.D. No. 51098)
E-mail: jellison@reedsmith.com
*Admitted Pro Hac Vice*
Luke E. Debevec (PA I.D. No. 92860)
E-mail: ldebevec@reedsmith.com
*Admitted Pro Hac Vice*
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Telephone No.: 215.851.8100
Fax No.: 215.851.1420

Attorneys for Plaintiff
The Madera Group, LLC

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE MADERA GROUP, LLC, | Case No.: 2:20-cv-07132-JAK-AFM |
| Plaintiff, | **AMENDED COMPLAINT FOR:** |
| vs. | **1) DECLARATORY JUDGMENT** |
| MITSUI SUMITOMO INSURANCE USA INC., | **2) BREACH OF CONTRACT** |
| | **3) REGULATORY ESTOPPEL** |
| Defendant. | **DEMAND FOR JURY TRIAL** |
| | Judge: Hon. John A. Kronstadt |
| | Courtroom: 10B |
| | Action Filed: August 7, 2020 |

AMENDED COMPLAINT

**AMENDED COMPLAINT FOR DECLARATORY JUDGMENT, BREACH OF CONTRACT, AND REGULATORY ESTOPPEL**

Plaintiff, The Madera Group, LLC, on behalf of itself and its insured subsidiaries (collectively, "Madera"), files this Amended Complaint for Declaratory Judgment, Breach of Contract, and Regulatory Estoppel against Defendant, Mitsui Sumitomo Insurance USA Inc. ("Mitsui"), alleging as follows:

## I.   NATURE OF ACTION

1.     This is an action for declaratory judgment, breach of contract, and regulatory estoppel arising out of the refusal of Mitsui to pay Madera's claim for direct physical loss of or damage to and related business income losses, costs, and expenses at twenty three (23) covered Madera locations under the "all risk" property insurance policy Mitsui sold to Madera in exchange for premiums paid.

2.     Madera seeks to enforce the obligations owed to it by Mitsui pursuant to the terms and conditions of the property insurance policy Mitsui sold to Madera.  The property insurance coverage at issue is one part of a larger insurance policy sold by Mitsui to Madera, which bears Policy Number PKG3127550 and covers the time period May 3, 2019 to May 3, 2020 (the "All Risk Policy"). The All Risk Policy is attached hereto as **Exhibit A**, and is incorporated herein by reference.

3.     Madera seeks a declaration that the United States government and public health system's failure to contain the spread of SARS-CoV-2 and the pandemic prevented Madera from accessing and using its property to conduct its ordinary business activities and deprived Madera of its property and the functionality of its property constituting "direct physical loss of or damage" to property within the meaning of that phrase as used in the All Risk Policy sufficient to trigger coverage under the All Risk Policy in favor of Madera, including under the coverages for Business Income loss, Extra Expense, and Additional Coverages, such as Civil Authority, Extended Business Income, and Dependent Properties – Miscellaneous Locations.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

4. Madera further seeks a declaration that the presence or suspected presence of the SARS-CoV-2 virus in or on property or the ubiquitous presence of the virus throughout California and Arizona – where Madera's covered restaurants are located; the need to alter physical aspects of buildings to continue or resume doing business; or alternatively, the loss of use of Madera's covered properties due to them being rendered unsafe or unusable for their intended purposes causes "direct physical loss of or damage" to property within the meaning of that phrase as used in the All Risk Policy sufficient to trigger coverage under the All Risk Policy, including under the coverages for Business Income loss, Extra Expense, and Additional Coverages, such as Civil Authority, Extended Business Income, and Dependent Properties – Miscellaneous Locations.

5. Madera also seeks a declaration that various orders issued by governmental authorities during the pandemic prevented Madera from accessing and using its insured property to conduct its ordinary business activities and deprived Madera of its property and the functionality of its property, thereby constituting "direct physical loss of or damage" to property within the meaning of that phrase as used in the All Risk Policy sufficient to trigger coverage under the All Risk Policy, including under the coverages for Business Income loss, Extra Expense, and Additional Coverages, such as Civil Authority, Extended Business Income, and Dependent Properties – Miscellaneous Locations.

6. Madera seeks a further declaration that the terms of the All Risk Policy obligate Mitsui to pay for direct loss of or damage to the premises described in the Schedule of Locations and Endorsements attached to the All Risk Policy, and all Business Income loss and Extra Expense incurred, including those expenses that would not have been incurred if there had not been direct loss of or damage to Covered Property; expenses to avoid or minimize the suspension of business and to continue operations at the described premises, replacement premises, or temporary locations, or to minimize the suspension of business where operations could not continue; and extra

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 3 –

expenses to repair or replace property, and to pay all incurred and to be incurred losses falling within the scope of Additional Coverages, including Civil Authority, Extended Business Income, and Dependent Properties – Miscellaneous Locations.

7.     Madera further seeks a declaration that the standard-form exclusion contained in the ISO Virus or Bacteria Endorsement Form CP 01 40 07 06 (the "ISO Virus or Bacteria Endorsement") that was attached to the All Risk Policy by Mitsui, a New Jersey insurance company, is inapplicable and does not apply to Madera's losses under the efficient proximate cause doctrine.

8.     Additionally, under the common law of New Jersey, Regulatory Estoppel precludes a New Jersey-based company from relying on and enforcing insurance policy provisions that were obtained through misrepresentations to governmental regulators. As such, Madera requests the Court rule that Mitsui cannot rely on the ISO Virus or Bacteria Endorsement that was attached to the All Risk Policy by Mitsui, a New Jersey insurance company.  To the extent the standard-form exclusion may apply to Madera's losses notwithstanding efficient proximate causation principles, which is specifically denied, the exclusion is invalid and unenforceable, and Mitsui is estopped from relying upon or seeking to enforce its terms due to the misrepresentations and false statements that were made to the New Jersey Department of Banking and Insurance and other state insurance departments nationwide as part of the process of obtaining regulatory approval for the exclusion's use in California, New Jersey, and elsewhere.  Madera also seeks monetary damages for Mitsui's breach of its obligations under the All Risk Policy as declared by the Court and to pay Madera's losses in full including, without limitation, loss mitigation costs.

## II.     **PARTIES**

9.     The Madera Group, LLC is a California limited liability company with its principal place of business in West Hollywood, California.  Madera is a citizen of California and Florida and does business at insured locations in California and Arizona.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

10.     Defendant Mitsui Sumitomo Insurance USA Inc. is a New York corporation having its principal place of business in Warren, New Jersey.  As a New Jersey-based insurance company, Mitsui's principal insurance regulator is the New Jersey Department of Banking and Insurance, which is its "home" regulator.

11.     Mitsui is, and at all relevant times herein, has been engaged in the business of selling property insurance policies, other insurance policies, and other products and services to, among others, companies like Madera located both in and outside of California.

## III.   JURISDICTION AND VENUE

12.     Jurisdiction is proper in this Court based on diversity jurisdiction following Mitsui's removal of Madera's original Complaint.  The amount in dispute exceeds the jurisdictional limit, and this action involves an actual controversy among the parties as to their respective rights and duties under the All Risk Policy with respect to Madera's claim described in paragraph 1 above.

13.     Venue is proper because Madera is located in this district; Mitsui does business in this district; the All Risk Policy that is the subject of this action was entered into, and to be performed in this district; and this district is where Mitsui's obligation or liability arose and where Mitsui's breach occurred.

## IV.   MADERA'S RESTAURANT BUSINESSES

14.      Madera owns a host of casual and upscale restaurants in California and Arizona, offering full menu, in-store dining for brunch, lunch, and dinner, together with event function spaces, catering, take-out service, and delivery.

15.     A full and complete listing of all of Madera's restaurants that are insured by the All Risk Policy is attached hereto as **Exhibit B**.  Madera is seeking coverage for all of the covered losses, costs, and expenses at each of the locations identified in Exhibit B.

## V.   THE COVID-19 GLOBAL PANDEMIC

16.    SARS-CoV-2 is highly transmissible and spreads rapidly.  For example, as of March 1, 2020, there were 87,137 confirmed COVID-19 cases across the globe.[1] That number increased to over 800,000 confirmed cases in April and over 3 million cases in May.[2] According to the Centers for Disease Control and Prevention ("CDC"), to date, SARS-CoV-2 has infected more than thirty-three million people and killed more than 600,000 people in the United States.[3]

17.    As of July 7, 2021, in the two states where Madera's insured restaurants are located, California has had over three million confirmed cases of COVID-19, resulting in over 63,000 deaths, and Arizona has had nearly 900,000 confirmed cases of COVID-19, resulting in over 18,000 deaths.[4]  At the pandemic's peak, over 4,000 Americans were perishing per day from COVID-19.[5]   A substantial number of Americans are still dying daily, with surges of cases and new and ever more contagious variants of SARS-CoV-2 occurring throughout the U.S.

18.    COVID-19 can be transmitted in several ways, including via human-to-human contact, airborne viral particles, particularly within enclosed properties like the insured locations, and touching surfaces or objects that have SARS-CoV-2 virions on them.

19.    COVID-19 spreads readily from person to person and person to surface or object.  Research has revealed that COVID-19 is primarily spread by small, physical droplets expelled from the nose or mouth when an infected person breathes, talks,

[1] *See* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200301-sitrep-41-covid-19.pdf.

[2] *See* https://graphics.reuters.com/CHINAHEALTH-MAP/0100B59S39E/index.html.

[3] *See* https://www.cnn.com/interactive/2020/health/coronavirus-us-maps-and-cases/.

[4] *COVID Data Tracker*, *United States COVID-19 Cases and Deaths by State*, CDC, https://covid.cdc.gov/covid-data-tracker/#cases_totaldeaths.

[5] *See* https://apnews.com/article/us-coronavirus-death-4000-daily-16c1f136921c7e98ec83289942322ee4.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

coughs, or sneezes.   A person who sneezes can release a cloud of SARS-CoV-2-containing droplets that can span as far as 23 to 27 feet.  The CDC has stated that SARS-CoV-2 virions are most likely to spread when people are within six feet of each other, but has also recognized that SARS-CoV-2 virions may spread from an infected person who is more than six feet away or who has left a given space.  Further, according to the CDC, longer exposure time likely increases the risk of exposure to COVID-19.

20.     Making matters worse, pre-symptomatic and asymptomatic individuals can also transmit COVID-19.[6]  Over 40% of all infections occur from people without any symptoms.[7]  Thus, even individuals who appear healthy and present no identifiable symptoms of the disease have and continue to spread the virus by breathing, speaking, or touching objects and surfaces.  These activities deposit SARS-CoV-2 virions in the air and on surfaces, rendering the air and surfaces changed from their previous condition.  According to the World Health Organization (the "WHO"), the incubation period for COVID-19, i.e., the time between exposure to SARS-CoV-2 and symptom onset, can be up to 14 days.  Other studies suggest that the period may be up to 21 days.

21.     Before infected individuals exhibit symptoms, i.e., the so-called "pre-symptomatic" period, they are most contagious as their viral loads will likely be very high and they may not know they have become carriers.  In addition, studies from the CDC and others estimate that 40% to 70% of infected individuals may never become symptomatic (referred to as "asymptomatic" carriers).   Pre-symptomatic and asymptomatic carriers are likely unaware that they are spreading SARS-CoV-2 by merely touching objects and surfaces, or by expelling droplets into the air.  The National Academy of Sciences has found that the majority of transmission is attributable to people who are not showing symptoms, either because they are pre-symptomatic or asymptomatic.

---

[6] *See* https://www.nature.com/articles/s41591-020-0869-5.

[7] *See id.*; https://www.nbcnews.com/health/healthnews/asymptomatic-covid-19-cases-may-be-more-common-suspected-n1215481.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

22.     Although these virus-containing droplets are very small, they are still physical objects that can travel within property and attach to surfaces, such as tables and door handles, and cause harm, loss, and damage, and physically alter the property and/or the integrity of the property.  Viruses, themselves, are microscopic and made up of genetic material surrounded by a protein shell,[8] but they are capable of being observed and can attach themselves to other things they encounter.  When virus-containing droplets make contact with surfaces and objects, they alter those surfaces and objects, although not in way perceptible by the naked human eye.  These virus-containing droplets physically exist ubiquitously in the communities and buildings in which Madera operates.

23.     According to the CDC and the WHO, a person may become infected by touching these surfaces or objects that have SARS-CoV-2 on them, and then touching his or her mouth, eyes, or nose.  When an uninfected person touches a surface containing SARS-CoV-2, the uninfected person may transmit COVID-19 to another person, by touching and infecting a second surface, which is subsequently touched by that other person.  The CDC has thus recommended certain physical and structural remedial measures for businesses to put into place to limit transmission and continued surface alteration.

24.     Numerous scientific studies have reported that SARS-CoV-2 can survive and persist within the air and on surfaces and buildings after infected persons are present at a given location.  Studies have found that SARS-CoV-2 remains active and dangerous suspended in the air in properties and on common surfaces, including plastic, stainless steel, glass, wood, cloth, ceramics, rubber, and even money.[9]  All of these materials are

---

[8] *See* https://rockedu.rockefeller.edu/component/what-are-viruses-made-of/.

[9] *See, e.g.,* https://www.thelancet.com/journals/lanmic/article/PIIS2666-5247(20)30003-3/fulltext; https://www.nih.gov/news-events/nih-research-matters/study-suggests-new-coronavirus-may-remain-surfaces-days.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

widely present at Madera's restaurants and insured locations and subject to touch by the multitudes of people visiting Madera's restaurants daily.

25.     Indoor spaces, especially highly trafficked ones like Madera's restaurants, are reportedly particularly susceptible to circumstances favorable to the spread of SARS-CoV-2 virions.  An article published by the CDC analyzed a case study of three families (families A, B, and C) who had eaten at an air-conditioned restaurant in Guangzhou, China.[10]  One member of family A, patient A1, had recently traveled from Wuhan, China.   On January 24, 2020, that family member ate at a restaurant with families A, B, and C.  By February 5, 2020, 4 members of family A, 3 members of family B, and 2 members of family C had become ill with COVID-19.  The only known source for those affected persons in families B and C was patient A1 at the restaurant. Moreover, another study detected SARS-CoV-2 inside the HVAC system connected to hospital rooms of sick patients.  The study found SARS-CoV-2 in ceiling vent openings, vent exhaust filters, and ducts located as much as 56 meters (over 183 feet) from the rooms of the sick patients.[11]

26.     Additionally, the CDC has stated, "[T]here is evidence that under certain conditions, people with COVID-19 seem to have infected others who were more than 6 feet away" and infected people who entered the space shortly after the person with COVID-19 had left.[12]  A published systematic review of airborne transmission of SARS-CoV-2 corroborated the CDC's concerns and recommended procedures to improve ventilation of indoor air environments to decrease bioaerosol concentration

---

[10] *See* https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article.

[11] Karolina Nissen, et al., *Long-distance airborne dispersal of SARS-CoV-2 in COVID-19 wards*, 10 NATURE SCI. REPORTS 19589 (Nov. 11, 2020), https://doi.org/10.1038/s41598-020-76442-2.

[12] CDC, *Scientific Brief: SARS-CoV-2 Transmission*, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fscience%2Fscience-briefs%2Fscientific-brief-sars-cov-2.html#anchor_1619805184733.

and physically reduce potential spread of SARS-CoV-2 in properties like the insured locations.[13]

27.    The CDC has recommended "ventilation interventions" to help reduce exposure to the airborne Coronavirus in indoor spaces, including increasing airflow and air filtration (such as with high-efficiency particulate air ("HEPA") fan/filtration systems).[14] These and other remedial measures must be implemented, at high cost and extra expense, to reduce the amount of SARS-CoV-2 present in a given space and to make property safe for its intended use.  These extreme measures demonstrate direct physical loss of or damage to interior spaces like the insured locations even where no virus is present.

28.    The proposition advanced by the insurance industry that an indoor space containing the infectious Coronavirus can be made safe and fit for its functional and intended use because the Coronavirus can be removed by routine surface cleaning is false.

29.    A number of studies have demonstrated that SARS-CoV-2 is "much more resilient to cleaning than other respiratory viruses so tested."[15] The measures that must be taken to remove SARS-CoV-2 virions from property are significant and far beyond ordinary or routine cleaning.

---

[13] Zahra Noorimotlagh, et al., *A systematic review of possible airborne transmission of the COVID-19 virus (SARS-CoV-2) in the indoor air environment*, 193 ENV'T RSCH. 110612, 1-6 (Feb. 2021), https://www.sciencedirect.com/science/article/pii/S0013935120315097?dgcid=rss_sd _all.

[14] CDC, *Ventilation in Buildings*, https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html#:~:text=HEPA%20filters%20are%20even%20more ,with%20SARS%2DCoV%2D2.

[15] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. MED. VIROLOGY 11, 2498-510 (June 12, 2020), https://onlinelibrary.wiley.com/doi/10.1002/jmv.26170.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

30.     Efficacy of decontaminating agents for viruses is based on a number of factors, including the initial amount of virus present, contact time with the decontaminating agent, dilution, temperature, and pH, among many others.  Detergent surfactants are not recommended as single agents, but rather in conjunction with complex disinfectant solutions.[16]

31.     Additionally, it can be challenging to determine accurately the efficacy of decontaminating agents.  The toxicity of an agent may inhibit the growth of cells used to determine the presence of virus, making it difficult to determine if lower levels of infectious virus are actually still present on treated surfaces.[17]

32.     In order to be effective, cleaning and decontamination procedures require strict adherence to protocols not necessarily tested under "real life" or practical conditions.  Studies of coronaviruses have demonstrated viral RNA persistence on objects despite cleaning with 70% alcohol.[18]

33.     When considering disinfection and decontamination, the safety of products and procedures must be considered as well, due to the risks of harmful chemical accumulation, breakdown of treated materials, flammability, and potential for allergen exposure.

34.     Moreover, the aerosolized SARS-CoV-2 particles and virions cannot be eliminated by routine cleaning.  Cleaning surfaces in an indoor space will not remove the aerosolized SARS-CoV-2 particles and virions from the air that people can inhale and develop COVID-19 – no more than cleaning friable asbestos particles that have landed on a surface will remove the friable asbestos particles suspended in the air that people can inhale.

---

[16] *Id.*

[17] *Id.*

[18] Joon Young Song, et al., *Viral Shedding and Environmental Cleaning in Middle East Respiratory Syndrome Coronavirus Infection*, 47 INFECTION & CHEMOTHERAPY 4, 252-5 (2015), https://www.icjournal.org/DOIx.php?id=10.3947/ic.2015.47.4.252.

35.     Moreover, given the ubiquity and pervasiveness of SARS-CoV-2, no amount of cleaning or ventilation intervention will prevent a person infected and contagious with the virus from entering an indoor space like the insured locations and exhaling millions of additional particles and virions into the air, further:  (a) filling the air with the aerosolized SARS-CoV-2 virions that can be inhaled, sometimes with deadly consequences; and (b) depositing SARS-CoV-2 particles and virions on surfaces, physically altering and transforming those surfaces into disease-transmitting fomites.

36.     Even as vaccines to protect against COVID-19 have recently become more available, distribution remains uneven in the United States.  Effective control of the disease's spread since the pandemic began has necessarily relied on measures designed to reduce human-to-human and surface-to-human exposure.   Similarly, the governmental orders closing or severely limiting use of non-essential business premises like Madera's business premises are one of the most common modes of preventing transmission of the disease because, among other things, the orders reduce the size and frequency of social gatherings and the physical use of properties.

## VI.   COVID-19 AND SARS-CoV-2 CAUSE DIRECT PHYSICAL LOSS AND DAMAGE

37.     Virologists, scientists, and researchers all have confirmed that SARS-CoV-2 remains viable and is active on physical surfaces and in the air.  The persistent presence of the deadly, viable SARS-CoV-2 on surfaces and in the air damages buildings and properties, rendering them damaged, unsafe, unfit, and uninhabitable for normal occupancy or use.

38.     Specifically, the scientific community has confirmed that SARS-CoV-2 and COVID-19 alter the conditions of properties and buildings such that the premises are physically damaged and no longer safe and habitable for normal use.  In this regard, SARS-CoV-2 and COVID-19 cause either direct physical loss of or damage to buildings and properties (or both).

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

39.     This direct physical loss of or damage to property (or both) results because SARS-CoV-2 has a corporeal existence and is contained in respiratory droplets.  Once expelled from infected individuals, these droplets land on and adhere to surfaces and objects and physically change these once safe surfaces to "fomites."  Fomites are objects, previously safe to touch, that now serve as a vehicle and mechanism for transmissions of an infectious agent.  Fomites are the result of SARS-CoV-2 physically changing air and property, making it unsafe.  This physical alteration and change makes physical contact with those previously safe indoor spaces and inert surfaces (*e.g.*, walls, handrails, tables) unsafe and potentially deadly.  This represents a physical change in the affected enclosed space, surface, or object, causing severe property loss and damage. Affected properties are unusable, dangerous, and unsafe until the COVID-19-related conditions are fully rectified.

40.     Medical and scientific research also has established that SARS-CoV-2 and COVID-19 spread through indoor airborne transmission.  When individuals carrying SARS-CoV-2 breathe, talk, cough, or sneeze, they expel aerosolized droplet nuclei that remain in the air, accumulate in buildings, and, like dangerous fumes, make the premises unsafe and affirmatively dangerous.  According to experts, buildings and properties accumulate the airborne SARS-CoV-2 indoors, which plays a significant role in community transmission.  As a result, SARS-CoV-2 and COVID-19 cause direct physical loss of or damage to properties and buildings (or both) by changing the physical condition of air in buildings from safe and breathable to unsafe and dangerous.

41.     Further, airborne viral particles are known to be able to spread into a facility's heating and ventilation ("HVAC") system, leading to transmission of SARS-CoV-2 from person to person.  The Environmental Protection Agency ("EPA") has recommended that facilities make improvements to their HVAC systems by, for example, increasing ventilation with air filtration and outdoor air. Accordingly, COVID-19 and SARS-CoV-2 cause direct physical loss of or damage to property (or both) by, among other things, destroying, corrupting, attaching to, and physically

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

altering property, including its surfaces, and by rendering property unusable, uninhabitable, unfit for intended functions, dangerous, and unsafe.

42.     Fomites, droplets, droplet nuclei, and aerosols containing SARS-CoV-2 are not theoretical, informational, or incorporeal, but rather are dangerous physical objects that have a tangible existence.  Their presence within an insured property causes direct physical loss of or damage to property (or both) by necessitating remedial measures that include, without limitation, repairing or replacing air filtration systems, remodeling and reconfiguring physical spaces, removal of fomites by certified technicians, and other measures.  The presence of COVID-19 and SARS-CoV-2 within an insured property also causes direct physical loss of or damage to properties (or both) by transforming property from usable and safe into a property that is unsatisfactory for use, uninhabitable, unfit for its intended function, and extremely dangerous and potentially deadly for humans.

43.     The presence of SARS-CoV-2 on property similarly creates the imminent threat of further damage to that property or to nearby property.  Individuals who come into contact, for example, with respiratory droplets at one location in the property by touching a door handle or a table, will carry those droplets on their hands and deposit them elsewhere in the property, causing additional damage and loss.  Property impacted by SARS-CoV-2 is just as dangerous as property impacted by fire or noxious fumes (if not more), and all such damaged property is equally incapable of producing revenues.  Like the impact of fire or noxious fumes, the impact of potentially fatal COVID-19 constitutes direct physical loss of or damage to property (or both).

44.     The direct physical loss of or damage to property (or both) described in this section has occurred at Madera's restaurants and business locations, leading to losses covered by the All Risk Policy.  Madera had to take action to secure and preserve its properties and its business operations.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## VII.   GLOBAL, NATIONAL, STATE, AND LOCAL ACTIONS CAUSE DIRECT PHYSICAL LOSS OR DAMAGE

### A.   The United States Government and Public Health System Failed to Contain the Spread of the COVID-19 Pandemic, Damaging Madera.

45.   On January 30, 2020, with the outbreak spreading outside of China and impacting many countries including the United States, the WHO declared the COVID-19 pandemic a Public Health Emergency of International Concern.

46.   The next day, the United States Department of Health and Human Services declared that a public health emergency existed nationwide because of confirmed cases of COVID-19 in the United States.

47.   The United States government was unable and failed to prevent the spread of the pandemic.  For example, the public health system was not prepared with an appropriate testing regimen and did not have procedures in place for contact tracing and isolating infected individuals.  It was only later that public health officials became aware that wearing masks was an effective means to control the spread of the disease.  Even then, government and public health officials sent mixed messages regarding the efficacy and need for wearing masks, and no uniform mandates were issued throughout the country.

48.   The state of the public health system in the United States, both before and after the start of the global pandemic, was unable to stop the rampant spread of the pandemic, which led to the presence of SARS-CoV-2 virions throughout the communities where Madera's businesses are located, in the immediate areas surrounding Madera's locations, and in Madera's insured locations.

49.   All of this caused Madera's restaurants to be rendered unsafe for their intended use, causing physical loss of or damage to property.  Before the pandemic was allowed to spread, Madera's restaurants were in a satisfactory condition, but because SARS-CoV-2 virions were permitted to spread throughout the communities where

Madera's restaurants are located, Madera's restaurants became unsafe for normal human occupancy and continued use, causing covered loss and damage to Madera.

50.     Even before COVID-19 was detected in China and made known throughout the world, the public health system in the United States was not prepared to handle a massive national healthcare emergency that would ultimately require stockpiles of medical supplies, adequate hospital and first responder staffing, and sufficient hospital facilities to handle the influx of new patients, in addition to the already existing level of patients being treated under normal circumstances.  The United States' public health system was also unequipped to handle the spread of the pandemic due to a lack of critical infrastructure for testing, contact tracing, and quarantining for those found exposed to the disease, or those who came into contact with someone confirmed to carry COVID-19.

51.     An article on Vox.com dated March 16, 2020, entitled "Coronavirus is exposing all of the weaknesses in the US health system," explained that "America was less prepared for a pandemic than countries with universal health systems … Before the crisis even began, the United States had fewer doctors and fewer hospital beds per capita than most other developed countries.  The rollout of COVID-19 testing has been patchy, reliant on a mix of government and private labs to scale up the capacity to perform the tens of thousands of tests that will be necessary."

52.     Similarly, an article in the New Yorker from March 17, 2020, titled "The Coronavirus and the Gutting of America's Public-Health System," discusses various reports finding that with the eroding infrastructure of America's public health system "comes a diminished capacity to predict, detect, and respond to an emerging infectious disease."

53.     As a result of the above conditions, the pandemic spread largely undetected into an unsuspecting United States population, and individuals infected by and spreading SARS-CoV-2 virions roamed undetected throughout communities, including in and throughout business locations like Madera's restaurants.  There was little

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

guidance from the United States government or public health officials regarding the safe operation of restaurants and similar businesses, including repairs and other modifications to facilities that could be implemented to allow for their safer operation and occupancy.

54.     It is a statistical certainty that SARS-CoV-2 virions circulated in air and on property in Madera's restaurants and/or employees and customers at Madera's restaurants were inadvertently spreading SARS-CoV-2 virions.  As early as February 26, 2020, the CDC advised that COVID-19 was spreading freely without the ability to trace the origin of new infections, also known as community transmission or community spread.  In April 2020, due to pervasive spread and presence of COVID-19 across the planet, SARS-CoV-2 virions were presumed to be present or imminently present everywhere.[19]

55.     Given the widespread presence of the disease within the communities where Madera's restaurants are and were located, it is statistically probable that individuals inadvertently spreading SARS-CoV-2 virions were present at Madera's restaurants.

56.     As a result of the United States government and public health system's failure to contain the spread of the COVID-19 pandemic, Madera's restaurants undertook efforts to respond to COVID-19, including making physical alterations to business locations that restricted uses of property and access to portions of property, resulting in additional physical loss of or damage to property.  In some cases, Madera's restaurants were even forced to close entirely.

---

[19] *See, e.g.*, Christopher Ingraham, *At the population level, the coronavirus is almost literally everywhere*, WASH. POST, Apr. 1, 2020, https://www.washingtonpost.com/business/2020/04/01/population-level-coronavirus-is-almost-literally-everywhere/.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**B.    State and Local Governmental Orders Damage Madera.**

57.    Beginning in early March 2020, state and local governments declared states of emergency and imposed orders in an effort to slow community spread of COVID-19.  To reduce and contain person-to-person and person-to-property-to-person transmission of the disease, these orders mandated closure to the public at large and suspension or severe curtailment of operations of certain businesses deemed "non-essential," including operations at Madera's restaurants.

58.    These orders effectively limited Madera's restaurants' on-premises dining and operations, resulting in an interruption of necessary operations and an immediate Business Income and Extra Expense loss.  These orders are identified in spreadsheets attached as **Composite Exhibit C**.

59.    When the orders were reduced in scope or modified in some respects such that Madera could resume some operations, SARS-CoV-2 was still at large.  Indeed, SARS-CoV-2 remains a risk to business employees and customers, more than a year after the first such order went into effect, but businesses are no longer subject to the same operational restrictions.  Regardless of what may have precipitated the closure orders, SARS-CoV-2 continues to exist.

**(a) Arizona**

60.    On or about March 11, 2020, Governor Douglas A. Ducey signed a Declaration of Emergency regarding COVID-19 (a copy of the declaration is attached herein to **Composite Exhibit D**).

61.    On or about March 19, 2020, the Governor of Arizona issued Executive Order 2020-09 (a copy of the order is attached herein to **Composite Exhibit D**), requiring all restaurants in counties with confirmed cases of COVID-19 to close public access to on-site dining and open only for drive-through, pick-up, or delivery options.

62.    Madera's restaurants in Arizona were located in counties with confirmed cases of COVID-19.  Moreover, Madera's restaurants in Arizona relied on on-site dining operations and could not financially subsist on drive-through, pick-up, or

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 18 –

delivery options.   Accordingly, operations were necessarily suspended at Madera's restaurants in Arizona, starting on or about March 20, 2020 (copies of relevant county and city orders are attached herein to **Composite Exhibit D**).

        **(b)California**

63.    On or about March 4, 2020, California Governor Gavin Newsom declared a State of Emergency in California (a copy of the declaration is attached herein to **Composite Exhibit D**).

64.    On or about March 16, 2020, the California Department of Public Health issued guidance, directing restaurants to suspend their on-site dining operations and open only for drive-through, pick-up, or delivery options (a copy of the guidance is attached herein to **Composite Exhibit D**).

65.    On or about March 19, 2020, the Governor of California issued Executive Order N-33-20 (a copy of the order is attached herein to **Composite Exhibit D**), imposing, among other restrictions in an effort to halt the spread of the COVID-19 pandemic, certain restrictions upon businesses that were not deemed part of "Essential Critical Infrastructure."

66.    Likewise, from mid-March through April 2020, California cities and counties where Madera has insured locations, including the City of Los Angeles and the City of San Diego, issued orders requiring restaurants to cease dine-in operations (copies of the orders are attached herein to **Composite Exhibit D**).

67.    The California orders' effect was to mandate closure of all businesses that were not deemed Essential Critical Infrastructure and that could not operate through remote-only operations.   Under the California orders, on-site dining at Madera's restaurants in California did not qualify as Essential Critical Infrastructure. Accordingly, operations were necessarily suspended at Madera's restaurants in California, starting on or about March 16, 2020.

68.    Prior to the issuance of any of the orders curtailing or suspending non-essential business operations, literally thousands of individuals would be present in

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

Madera's restaurants on a daily basis.

69.     The vast majority of those individuals were in-restaurant diners, who would spend a substantial period of time in the restaurant consuming a meal and often enjoying the company of others in settings involving conversation and close interaction among individuals.

70.     Given the number of infected individuals, it is a virtual certainty that infected individuals, both symptomatic and asymptomatic, were present in Madera's restaurants on a daily basis even prior to the issuance of the governmental orders and would have been present daily in Madera's restaurants in an ever-increasing number in the absence of the issuance of those orders.

71.     For the reasons described above, the United States government and public health system's failure to contain the spread of the pandemic, the governmental orders, and/or SARS-CoV-2 caused a total or partial prohibition of access to Madera's restaurants as well as total or partial interruption of Madera's business operations.  The direct physical loss of or damage to property (or both) caused by these covered causes of loss devastated Madera's business operations.   The closure orders physically impacted and caused losses to Madera's business operations without regard to whether virus was or was not present at any Madera restaurant or insured location.

## VIII.  <u>MADERA SUFFERED AND CONTINUES TO SUFFER COVERED LOSSES</u>

72.     The United States government and public health system's failure to contain the spread of the COVID-19 pandemic, the issuance of the civil authority orders by state and local governmental authorities, and the statistically probable and ubiquitous presence of SARS-CoV-2 virions at or near Madera's restaurants  are all covered causes of loss, not otherwise excluded under the All Risk Policy.

73.     The United States government and public health system's failure to contain the spread of the COVID-19 pandemic, the issuance of the civil authority orders by state and local governmental authorities, and the statistically probable and ubiquitous

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

presence of SARS-CoV-2 virions at or near Madera's restaurants, have all been catastrophic for Madera's restaurant businesses – interrupting their operations so pervasively as to effectively force the insured locations to endure a prolonged curtailment of earnings.

74.   The United States government and public health system's failure to contain the spread of the COVID-19 pandemic, the issuance of the civil authority orders by state and local governmental authorities, and the statistically probable and ubiquitous presence of SARS-CoV-2 virions at or near Madera's restaurants, have also caused direct physical loss of or damage to the immediate surrounding properties Madera depends on to attract business to its insured locations.

75.   Madera's insured locations are within one mile of many eateries, bars, retail establishments, entertainment venues, and hotels that have also suffered and continue to suffer direct physical loss of or damage due to the United States government and public health system's failure to contain the spread of the COVID-19 pandemic, the issuance of the civil authority orders by state and local governmental authorities restricting and/or barring access to these businesses and properties, and the statistically probable and ubiquitous presence of SARS-CoV-2 virions at or near Madera's restaurants.  These surrounding businesses are "dependent properties" under the terms of the All Risk Policy.

76.   These covered causes of loss have operated to prohibit and/or severely restrict access to Madera's restaurants and to the immediate surrounding businesses and properties.

77.   These covered causes of loss are not otherwise excluded under the All Risk Policy.

78.   These covered causes of loss including the closure orders issued by California and Arizona officials have directly impacted Madera's restaurants, which do not qualify as essential businesses.  These far-reaching restrictions and prohibitions on the activities that can be conducted at its locations have been catastrophic for Madera's

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

restaurants – having interrupted their operations so pervasively as to effectively force them to close, thereby enduring a prolonged curtailment of earnings that threatened their survival.

## IX.   THE INSURANCE COVERAGE PURCHASED BY MADERA

79.   Madera and its restaurants, listed in the Schedule of Locations and Endorsements, are entitled to the insurance coverage provided by the All Risk Policy sold to them by Mitsui for the period May 3, 2019 to May 3, 2020.

80.   The Madera Group, LLC and its restaurants are Named Insureds under the All Risk Policy.

81.    Madera paid all premiums due to Mitsui to purchase the All Risk Policy and complied with all applicable conditions of coverage.

82.   The policy sold to Madera is an "all-risk" insurance policy.  An "all-risk" policy provides the broadest coverage available to policyholders for protection of their property interests, including the disruption to their business operations.  Under an all-risk policy, the insured's burden is limited—the insured need only show that a loss occurred and that the loss was fortuitous. The burden then shifts to the insurer to show that an express exception in the policy either bars or limits coverage.

83.   The damages, Business Income loss, Extra Expense, costs, and other losses incurred and continuing to be incurred by Madera are covered under the All Risk Policy sold to Madera by Mitsui.

84.   The Building and Personal Property Coverage Form attached to the All Risk Policy sold to Madera covers "direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."  The premises described are identified further in the Schedule of Locations and Endorsements attached to the All Risk Policy.

85.   The Business Income and Extra Expense Coverage Form attached to the All Risk Policy sold to Madera provides insurance coverage for the "actual loss of

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

Business Income … sustain[ed] due to the necessary 'suspension' of [Madera's] 'operations'" and in the event there are "necessary expenses … incur[red] … that [Madera] would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss."

86.     The All Risk Policy does not define the phrase "physical loss of or damage to property."

87.     The presence of the disjunctive "or" in "physical loss of or damage to property" means that coverage is triggered if *either* a physical loss of property or damage to property occurs.

88.     Physical loss of or damage to property may be reasonably interpreted to occur when a covered cause of loss threatens or renders property unusable or unsuitable for its intended purpose or unsafe for normal human occupancy and/or continued use. These words also reasonably encompass the need to alter properties physically to continue doing business.  Additionally, these words reasonably include the prohibitions and restrictions on physical access to businesses and properties engendered by the civil authority orders.

89.     Here, where the All Risk Policy requires "direct physical loss of" property to trigger Additional Coverages, these coverages are triggered by government orders and resulting inability to use property.

90.     Madera incurred Extra Expense to resume and continue as nearly as practicable its normal business activities that would otherwise be suspended due to physical loss or damage caused by the Coronavirus and COVID-19, including costs associated with altering its property to protect the property from physical loss or damage, such as erecting barriers, reconfiguring indoor spaces, and disinfecting surfaces and materials.

91.     Additional Coverage is provided in the All Risk Policy for Civil Authority, "when a Covered Cause of Loss causes damage to property other than property at the described premises," and "action of civil authority . . . prohibits access to the described

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 23 –

premises," and as a result, the policyholders sustain "actual loss of Business Income" or are caused to incur necessary Extra Expense.

92.   Additional Coverage is provided in the All Risk Policy for Extended Business Income as follows:

**(1)   Business Income Other Than "Rental Value"**
If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur that begins and is discovered by you after the "period of restoration" (for property except "finished stock") but within 24 months after the date of loss. The coverage for Business Income will apply through the time it takes to restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred.

\*\*\*

93.   Additional Coverage is provided in the All Risk Policy for Dependent Properties – Miscellaneous Locations as follows:

**Dependent Properties – Miscellaneous Locations**
(1)   We will pay the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration".  The "suspension" must be caused by direct physical loss of or damage to "dependent property" at premises not described in the Declarations caused by or resulting from a Covered Cause of Loss. . . .

\*\*\*

94.   Policyholders like Madera are entitled to order and call upon coverages purchased in a way that maximizes reimbursement for losses suffered.  Even where a policy affords coverages that overlap in part, the policyholder is entitled to elect which coverage it wishes to access for a particular loss.

95.   None of the exclusions in the All Risk Policy precludes coverage for Madera's claim.

96.   Most of the terms contained in the All Risk Policy sold to Madera are not the product of discussions or negotiations between Mitsui and any individual

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

– 24 –

policyholder, including Madera.  Rather, significant portions of the All Risk Policy primarily consist of standardized language and terms that have been developed by the insurance industry through its trade associations and are used industry-wide and nationwide.  These terms have acquired specialized meaning and application over time as they have been interpreted by courts.

97.    Moreover, a limited exemption from the application of the federal antitrust laws permits members of the insurance industry collectively to discuss, adopt, and utilize standardized terms and provisions.  *See* 15 U.S.C. § 1011-1013.  This exemption is conditioned upon state regulation of the insurance industry.  Similarly, members of the insurance industry like Mitsui are exempt from the application of antitrust laws to the extent that their activities are subject to regulation by state insurance commissioners, including those of New Jersey and California.

98.    By choosing New Jersey as its headquarters, Mitsui chose to subject itself to the public policies of New Jersey and that jurisdiction's interest in regulating the conduct of businesses that operate there.  As Mitsui's corporate headquarters are in New Jersey, the New Jersey Department of Banking and Insurance serves as Mitsui's lead insurance regulator.

99.    The unique exemption from the application of federal antitrust laws for members of the insurance industry, which empowers them to collaborate on and adopt standardized terms subject only to state approval, rests on the recognition that these insurance companies have public as well as merely private obligations.  In particular, standardized terms are designed to serve the public interest by facilitating uniformity of insurance coverage and consistency in the interpretation of the basic terms of property insurance policies like the All Risk Policy at issue.

100.   Also, standardized terms of coverage have been necessary for insurance industry associations for the accumulation of loss data on uniform coverage.  The insurance industry associations rate risks based on this loss data, and individual insurance companies calculate their premiums based on that rating of risks.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

AMENDED COMPLAINT

101.   Because of the standardization of the language and terms in property insurance policies like these, questions of policy interpretation concerning standard-form language in the insurance forms sold to Madera by Mitsui must be addressed on a standardized basis.

102.   Standard form language included in Madera's All Risk Policy and in dispute in this action includes the entirety of the ISO Virus or Bacteria Endorsement and the provision requiring "direct physical loss of or damage to Covered Property," among other wording referencing this terminology upon which Mitsui relied in denying coverage.

## X.    THE HISTORY OF INTERPRETATION OF "DIRECT PHYSICAL LOSS OF OR DAMAGE" TO PROPERTY AND DEVELOPMENT OF THE ISO VIRUS OR BACTERIA ENDORSEMENT

### A. Overview: The Insurance Industry Lied About the ISO Virus and Bacteria Endorsement Even After Courts Applied Regulatory Estoppel in Response to Prior Insurance Industry Lies About "Clarifying" Exclusions for Pollution and Contamination

103.   Mitsui should be estopped from relying upon or seeking to enforce the terms of the ISO Virus or Bacteria Endorsement in relation to Madera's claim, due to misrepresentations to New Jersey and California state insurance regulators in the process of obtaining each state's approval of that endorsement, by Mitsui and its agents, the insurance industry drafting organizations.

104.   New Jersey and California, like most states, each requires the filing of insurance policy forms and provisions with state insurance regulators.  In New Jersey, California, and nationwide, rating organizations such as the Insurance Services Office ("ISO") and the American Association of Insurance Services ("AAIS") have filed and do file insurance policy forms on behalf of their members, their subscribers, and those who use the approved forms.  As such, ISO and AAIS serve as agents for the insurance industry members that choose to use the insurance policy forms of which they obtain approval for use.  As an insurance company that attached the ISO Virus or Bacteria

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Endorsement to the All Risk Policy, Mitsui chose to have ISO and AAIS function as its agent.

105.    The New Jersey Department of Banking and Insurance Commissioner and the California Insurance Commissioner are each responsible for approving proposed insurance policy language and rates and, thereby, protecting the interests of the insurance-buying public.  The New Jersey and California Insurance Commissioners each act as the agent of policyholders because each is charged by law to protect the interests of policyholders and to ensure that insurance companies provide reasonable, equitable, and fair treatment to the public.

106.    The ISO Virus or Bacteria Endorsement was introduced by the insurance industry in 2006. Industry representatives from ISO and AAIS sought and obtained approval for their new endorsements from New Jersey and California's insurance regulators, but this was not done in a vacuum.  As discussed in greater detail below, prior to that time, many courts, insurance companies, and policyholders in New Jersey, California, and elsewhere interpreted then-existing exclusions in property and casualty insurance policies for "pollutants" or "contaminants" as not excluding insurance coverage for property damage, bodily injury, and various other losses resulting from disease-causing agents such as viruses.

107.    Nevertheless, the insurance industry falsely told New Jersey, California, and other state insurance regulators in 2006 that contamination of property with "disease-causing agents" was not covered by property insurance policies and that the newly proposed virus exclusions were a mere "clarification" of existing coverage, a demonstrably false statement.  As discussed in greater detail below, in 2006, long after the insurance industry was disciplined by courts in New Jersey and elsewhere for their lies about new pollution exclusions introduced in 1970 and 1985, insurance companies in the property and casualty insurance industry filed new exclusions in 2006 purporting to exclude losses involving virus, while claiming that this coverage being excluded did not previously exist anyway.  The insurance industry should have learned to tell the

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

truth by this point, but Mitsui and its insurance industry drafting organization agents, ISO and AAIS, did not.

108.   ISO's new endorsement was recognized as deceptive by other members of the insurance industry at the time it was introduced in 2006, but Mitsui nevertheless proceeded to use this exclusion and attach it to the All Risk Policy as a standard term.

109.   Mitsui's use of the 2006 ISO Virus or Bacteria Endorsement amounts to Mitsui adopting the misrepresentations and misleading conduct of ISO and AAIS as its own, such that Mitsui must be precluded from reaping the benefits of the enforcement of the exclusion whose approval was obtained under false pretenses.

110.   Throughout this time period, Mitsui never corrected the misrepresentations by ISO and AAIS and instead chose to profit from misrepresentations made on behalf of Mitsui and other insurance companies.

111.   As a New Jersey insurance company, Mitsui's conduct is particularly egregious and offensive to the public policy of New Jersey because Mitsui is well aware that nearly identical misrepresentations by ISO in the state regulatory process in 1970 and 1985 resulted in the insurance industry being estopped from enforcing certain pollution and contamination exclusions in New Jersey.  Despite that knowledge, ISO and Mitsui repeated the exact, wrongful conduct when choosing to attach the ISO Virus or Bacteria Endorsement to the All Risk Policy.

112.   As a result of this misconduct by its agents that is binding on Mitsui, the All Risk Policy's ISO Virus or Bacteria Endorsement is invalid and unenforceable, and Mitsui should be estopped from relying upon or seeking to enforce its terms in relation to Madera's claim.

**B. The Insurance Industry and ISO Received Previous Reprimands for Their False Statements About the Impact of New Exclusions on Existing Coverage**

113.   At the time the ISO Virus or Bacteria Endorsement was introduced by the insurance industry in 2006, the insurance industry had previously been reprimanded and

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

estopped from enforcing exclusions by numerous courts across the country for publicly misrepresenting to insurance regulators and policyholders that "pollution" exclusions introduced in standard-form comprehensive general liability policies in 1970 were not reductions in coverage, but merely "clarifications" for which no rate change would be required.

114.   This trend was led by the New Jersey Supreme Court and supported by the State of New Jersey as an amicus, among many others.  The New Jersey courts held that the insurance industry was estopped from attempting to contradict misleading representations to state insurance regulators that new exclusions were "mere clarifications" and did not significantly reduce coverage.  *See Morton Int'l, Inc. v. Gen. Accident Ins. Co.*, 629 A.2d 831, 848 (N.J. 1993), *cert. denied,* 512 U.S. 1245 (1994); *Essex Chem. Corp. v. Hartford Accident & Indem. Co.*, No. 93-3438, slip op. at 1, 9 (D.N.J. Sept. 16, 1997) (extending the doctrine of regulatory estoppel to insurance companies that employ exclusions similar to those discussed in *Morton*), *aff'd*, 261 F.3d 491 (3d Cir. 2001).

115.   The *Morton International* court under the common law principle of "regulatory estoppel" declined to enforce the standard pollution-exclusion clause as written, because "[t]o do so would contravene this State's public policy requiring regulatory approval of standard industry-wide policy forms to assure fairness in rates and in policy content, and would condone the industry's misrepresentation to regulators in New Jersey and other states concerning the effect of the clause."  *Morton Int'l*, 629 A.2d at 848.

116.   The *Morton International* court was alarmed that ISO and insurance industry members were "misleading" and "perilously close to deception" in describing a significant reduction in coverage as a "clarification," pointing out that a more truthful statement about the intent to restrict coverage would have required the regulators to consider a premium reduction:  "To describe a reduction in coverage of that magnitude as a 'clarification' not only is misleading, but comes perilously close to deception.

Moreover, had the industry acknowledged the true scope of the proposed reduction in coverage, regulators would have been obligated to consider imposing a correlative reduction in rates."

117.   The California Supreme Court recognized regulatory estoppel to be the impetus for insurance companies' subsequent exclusions for contamination that were even broader.  *See, e.g., MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205 (Cal. 2003); *Doerr v. Mobil Oil Corp.*, 774 So. 2d 119 (La. 2000); *Joy Techs., Inc. v. Liberty Mut. Ins. Co.*, 421 S.E.2d 493 (W. Va. 1992); *Ala. Plating Co. v. U.S. Fid. & Guar. Co.*, 690 So. 2d 331 (Ala. 1996); *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189 (Pa. 2001).

118.   In fact, when insurance companies attempted to apply even broader exclusions in 1985 to risks other than traditional environmental contamination, contrary to regulatory representations, many courts judicially estopped the insurance companies from applying the exclusions in contradiction of their false statements to state insurance regulators or otherwise restricted the scope of the exclusions.  *See, e.g.*, *Nav-Its, Inc. v. Selective Ins. Co. of Am.*, 869 A.2d 929, 939 (N.J. 2005) (holding that absolute pollution exclusion "should be limited to traditional environmental pollution" and "disapprov[ing] any contrary view expressed in [prior] case law"); *MacKinnon*, 73 P.3d at 1216 (restricting scope of absolute pollution exclusion); *Doerr*, 774 So. 2d at 136.

119.   Despite this history of misrepresentations by ISO to New Jersey, California, and other states' insurance regulators about exclusions introduced with no rate change that were misleadingly termed as "clarifications," as described below, the insurance industry led by ISO made nearly identical misrepresentations in 2006 to obtain approval for the ISO Virus or Bacteria Endorsement to the standard commercial property insurance form.

120.   As with similarly deceptive efforts to approve earlier pollution and contamination exclusions in 1970 and 1985, this was largely accomplished through filings with state insurance regulators by the leading insurance industry trade groups

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

that insurance companies use to share rates and loss information and develop regulator-approved, standardized policy forms.

### C. By 2006, Courts and Insurance Companies Had Already Long Recognized Coverage for Losses Involving Virus, Bacteria, and Physical Conditions Making Property Unsafe, Unfit, or Incapable of Use.

121.   Prior to introduction of the ISO Virus or Bacteria Endorsement in 2006, described in greater detail below, the threat of or the actual presence of a deadly virus or bacteria on property was well understood to constitute physical loss of or damage to that property, and property damage was generally understood to occur in a variety of circumstances where property is rendered unusable for its intended purpose—even if the bricks or mortar of the property have not been harmed.

122.   For fifty years, a strong majority of courts interpreting property and business income insurance policies had concluded that physical loss of or damage to property includes physical conditions that cause property to be simply too unsafe to inhabit or use.  As but one example, in *Hughes v. Potomac Insurance Co.*, 18 Cal. Rptr. 650, 655 (Cal. Ct. App. 1962), the court found the policyholder's home, which became perched on the edge of a cliff after a sudden landslide caused a large chunk of the ground surrounding their property to fall into a creek (depriving the home of lateral support and stability), was damaged because it became unsafe to live in and thus useless to the owners:

> To accept [the insurance company's] interpretation of its policy would be to conclude that a building which has been overturned or which has been placed in such position as to overhang a steep cliff has not been "damaged" so long as its paint remains intact and its walls still adhere to one another. Despite the fact that a "dwelling building" might be rendered completely useless to its owners, [the insurance company] would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected.  Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner.  **[The policyholders] correctly point out that a "dwelling" or "dwelling building" connotes a place fit for occupancy,**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**a safe place in which to dwell or live.** It goes without question that [the policyholders'] "dwelling building" suffered real and severe damage when the soil beneath it slid away and left it overhanging a 30-foot cliff. Until such damage was repaired and the land beneath the building stabilized, the structure could scarcely be considered a "dwelling building" in the sense that rational persons would be content to reside there. We conclude that [the insurance company's] policy should and can be interpreted in such a manner as to cover the damage to [the policyholders'] "dwelling building" as a result of the landslide.

123.   Likewise, in the liability insurance context, the California Supreme Court ruled that an absolute pollution exclusion did not apply to injuries from fumes from application of pesticide in *MacKinnon v. Truck Insurance Exchange*, 73 P.3d 1205 (Cal. 2003), and in the property insurance context, a California federal court had held the pollution exclusion did not bar coverage for losses sustained after health officials closed a policyholder's restaurant because its well water tested positive for E. coli contamination in *Cooper v. Travelers Indemnity Co. of Illinois*, No. C-01-2400-VRW, 2002 WL 32775680 (N.D. Cal. Nov. 4, 2002), *aff'd*, 113 Fed. Appx. 198 (9th Cir. 2004).

124.   Similarly, in *Murray v. State Farm Fire & Casualty Co.*, 509 S.E.2d 1 (W. Va. 1998), the policyholder sought coverage for the complete loss of its home after continued occupancy was rendered dangerous by the presence of falling rocks under a policy providing coverage for "direct physical loss to the property." The court rejected the insurance companies' argument that, while their policies were obligated to cover actual physical damage from falling rocks, they did not "cover any losses occasioned by the potential damage that could be caused by future rockfalls," because "'[d]irect physical loss' provisions require only that a covered property be injured, not destroyed. Direct physical loss also may exist in the absence of structural damage to the insured property." Moreover, "[l]osses covered by the policy, including those rendering the insured property unusable or uninhabitable, may exist in the absence of structural damage to the insured property."

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

125.   Prior to 2006, based on judicial opinions in numerous civil actions across the United States, insurance companies were aware that covered property damage and resulting business income loss and extra expenses could be caused by an array of noxious and untenable conditions impacting property, including the following:

    a.     Infusion of a factory with radioactive dust and radon gas;[20]

    b.     The presence of carbon monoxide, mold, mildew, asbestos, or lead in buildings;[21]

---

[20] *Am. Alliance Ins. Co. v. Keleket X-Ray Corp.*, 248 F.2d 920, 925 (6th Cir. 1957) (finding, where the policyholder manufactured instruments used in measuring radioactivity, and its operations were interrupted by an incident that caused radioactive dust and radon gas to infuse the factory, this was Property Damage supporting a claim for Business Income).

[21] *Yale Univ. v. CIGNA Ins. Co.*, 224 F. Supp. 2d 402, 413 (D. Conn. 2002) (finding while the subject presence of asbestos and lead in buildings did not constitute "physical loss of or damage to property," contamination by such materials could, citing "the substantial body of case law" "in which a variety of contaminating conditions have been held to constitute 'physical loss or damage to property'"); *Bd. of Educ. v. Int'l Ins. Co.*, 720 N.E.2d 622, 625-26 (Ill. App. Ct. 1999) (citing liability insurance coverage cases finding that incorporation of asbestos into buildings caused "property damage," defined under liability policies to be "physical injury to or destruction of tangible property," and finding that, for purposes of summary judgment, the policyholder had established that the asbestos fiber contamination constituted Property Damage); *Sentinel Mgmt. Co. v. Aetna Cas. & Sur. Co.*, 615 N.W.2d 819, 825-26 (Minn. 2000) (considering asbestos contamination of carpeting and other surfaces in apartment building and holding (1) "even though 'asbestos contamination does not result in tangible injury to the physical structure of the building, a building's function may be seriously impaired or destroyed and the property rendered useless by the presence of contaminants,' thereby satisfying the definition of direct physical loss"; and (2) "[a] principal function of any living space [is] to provide a safe environment for the occupants" and "[i]f rental property is contaminated by asbestos fibers and presents a health hazard to the tenants, its function is seriously impaired"); *Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts*, No. CV-01-1362-ST, 2002 WL 31495830, at *8-9 (D. Or. June 18, 2002) (concluding that mold damage to house which caused policyholder to abandon house and personal property could constitute "distinct and demonstrable" damage, sufficient to constitute "direct" and "physical" loss, and citing *W. Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52 (Colo. 1968) and *Matzner v. Seaco Ins. Co.*, 1998 Mass. Super. LEXIS

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

c.     The occurrence of vibrations that cause equipment to shut down without being damaged;[22]

d.     The malicious addition of chemicals to a sewage plant that destroy a bacteria colony;[23]

e.     The contamination of a well or contamination of a home with E. coli bacteria;[24]

f.     The spread of dust, soot, and smoke through a law firm as a result of 9/11;[25]

---

407, 1998 WL 566658 (Mass. Super. Ct. Aug. 26, 1998) for the proposition that inability to inhabit a building may constitute "direct, physical loss"); *Columbiaknit, Inc. v. Affiliated FM Ins. Co.*, No. 98-434-HU, 1999 WL 619100, at *7-*8 (D. Or. Aug. 4, 1999) (finding that policyholder could bear its burden to demonstrate that clothes impregnated with mold or mildew suffered "direct physical loss or damage" if it established "at trial a class of garments which has increased microbial counts and that will, as a result, develop either an odor or mold or mildew").

[22] *Cyclops Corp. v. Home Ins. Co.*, 352 F. Supp. 931, 937 (W.D. Pa. 1973) (finding policyholder entitled to coverage for loss of Business Income where vibration of motor, without apparent damage, caused it to be shut down).

[23] *Azalea, Ltd. v. Am. States Ins. Co.*, 656 So. 2d 600, 602 (Fla. Dist. Ct. App. 1995) (finding that where policyholder operated a mobile home park at which vandals damaged the sewage treatment plant by adding chemicals that destroyed a bacteria colony necessary for the plant to operate, this amounted to "direct damage to the structure").

[24] *Cooper v. Travelers Indem. Co.*, No. C-01-2400, 2002 WL 32775680, at *5 (N.D. Cal. Nov. 4, 2002) (finding policyholder could make claim for Business Income and Extra Expense loss from contamination of well with E. coli bacteria); *see also Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 827 (3d Cir. 2005) (considering an infestation of a home with E. coli bacteria, the court held that there was "a genuine issue of fact whether the functionality of the [policyholder's] property was nearly eliminated or destroyed, or whether their property was made useless or uninhabitable," and thus reversed the lower court's ruling in favor of the insurance company).

[25] *Schlamm Stone & Dolan, LLP v. Seneca Ins. Co.*, No. 603009/2002, 2005 WL 600021, at *3-5 (N.Y. Super. Ct. Mar. 16, 2005) (finding that dust, soot, smoke, and debris in the premises of a law firm after September 11, 2001 affected its operations for the balance of the month of September, and that this was physical loss or damage

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 34 –

g.     The fumigation of otherwise undamaged food beans with a substance not acceptable to customers in the United States market;[26]

h.     The production of "off-tasting" soda that had not been rendered unfit for human consumption;[27]

i.     The impact of odor in a house from an illegal methamphetamine lab;[28]

---

for purposes of Business Income coverage regardless of whether the law firm sought recovery for this Property Damage: "the presence of noxious particles, both in the air and on surfaces of the plaintiff's premises, would constitute property damage under the terms of the policy").

[26] *Blaine Richards & Co. v. Marine Indem. Ins. Co.,* 635 F.2d 1051, 1055–56 (2d Cir. 1980) (finding that policyholder would have coverage for beans, which had been fumigated with a substance not acceptable in the United States, noting "[t]he fact that the beans were not marketable in this state suggests that they were damaged in an important respect," and holding that policyholder could recover for both (1) beans found to be contaminated and (2) beans not contaminated but not accepted by customers).

[27] *Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.,* 806 N.Y.S.2d 709, 711 (N.Y. App. Div. 2005) (finding that "off tasting" soft drink had suffered physical damage: "It is sufficient under the circumstances of this case involving the unmerchantability of beverage products that the product's function and value have been seriously impaired, such that the product cannot be sold. Neither the fact that the product was not rendered unfit for human consumption nor the fact that the product's unmerchantability may have gone undetected initially, mean that a physical event did not occur for which injury or damage resulted.").

[28] *Farmers Ins. Co. v. Trutanich*, 858 P.2d 1332, 1335 (Or. Ct. App. 1993) (rejecting the insurance company's argument that the cost of removing odor caused by methamphetamine lab was not a "direct physical loss," stating "[t]here is evidence that the house was physically damaged by the odor that persisted in it," "the odor produced by the methamphetamine lab had infiltrated the house," and "[t]he cost of removing that odor was a direct rectification of the problem"); *Largent v. State Farm Fire & Cas. Co.*, 842 P.2d 445, 446 (Or. Ct. App. 1992) (considering application of exclusion where insurance company had conceded that odor damage to a house from an illegal methamphetamine lab was direct physical loss or damage).

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 35 –

j.    Exposures of meat, corn, cardboard food containers and other products to health-threatening organisms, ammonia, smoke and pesticides;[29] and

k.    Infestation of a house with brown recluse spiders.[30]

126.   As these and similar examples demonstrate, insurance companies have long been aware that an event like the presence or suspected presence of the SARS-CoV-2 virus in a building or area that makes property too dangerous to use as it was

---

[29] *Pillsbury Co. v. Underwriters at Lloyd's, London*, 705 F. Supp. 1396, 1401 (D. Minn. 1989) (holding, where the policyholder experienced difficulties in destroying organisms in its creamed corn, which it was unable to solve, forcing it to destroy all cans of such corn, that the underprocessing of the cream-style corn was a loss covered by the policy; i.e., that the creamed corn had suffered physical loss or damage); *Henri's Food Prods. Co. v. Home Ins. Co.*, 474 F. Supp. 889, 892 (E.D. Wis. 1979) (holding, where policyholder's salad dressings were seized by the government after they were contaminated by vaporized agricultural chemicals stored in the same warehouse which had become vaporized during storage, policyholder "incurred a loss since its products were injured"); *Gen. Mills, Inc. v. Gold Medal Ins. Co.*, 622 N.W.2d 147, 152 (Minn. Ct. App. 2001) (finding where a subcontractor treated the policyholder's stored oats with a pesticide that this amounted to physical loss or damage to property, even though the pesticide was chemically identical to an approved pesticide, because: "[the policyholder] was unable to sell its products or use the contaminated oats, because of legal regulations. The business of manufacturing food products requires conforming to the appropriate FDA regulations. Whether or not the oats could be safely consumed, they legally could not be used in [the policyholder's] business").

[30] *Cook v. Allstate Ins. Co.*, No. 48D02-0611-PL-01156, slip op. at 6-8 (Ind. Super. Ct. Nov. 30, 2007) (finding that infestation of house with Brown Recluse Spiders constituted "sudden and accidental direct physical loss" to the house: "The Court also finds that the undisputed evidence demonstrates a 'sudden and accidental direct physical loss' as a matter of law….Case law demonstrates that a physical condition that renders property unsuitable for its intended use constitutes a 'direct physical loss' even where some utility remains and, in the case of a building, structural integrity remains….Brown Recluse Spiders living, breeding and hunting on and within surfaces of the Home are a physical condition that renders the Home unsuitable for its intended use. The undisputed evidence is that the Brown Recluse Spiders make it unsafe for [the policyholder] and his very young children to live in the home and also that [the policyholder] had not been able to sell the Home, even at a loss.").

designed to be used, causes direct physical loss of or damage to that property.  Like other temporary and permanent physical conditions that make property too dangerous to use, the presence or suspected presence of a dangerous virus on property or in property elsewhere in the community, or governmental orders rendering property unusable due to related safety concerns, constitutes "direct physical loss of or damage."

127.   As will be proven at trial, insurance company submissions by Mitsui's agents, ISO and AAIS, to state insurance regulators in 2006 demonstrate that insurance companies worldwide were well aware of this truth when they told state insurance regulators the opposite—just as they are now misinforming courts and impacted policyholders like Madera.

### D. The Insurance Companies' 2006 Deception Allows Mitsui to Add the ISO Virus or Bacteria Endorsement to Madera's All Risk Policy.

128.   In 2006, the ISO and the AAIS represented thousands of members and subscribing insurance companies in seeking regulatory approval in each state for new virus or bacteria exclusions, while some individual insurance companies submitted their own broader or narrower wordings for approval.  In their agency capacity, these organizations sought approval from each of the state insurance regulators for new exclusions referencing "virus" and "disease causing agents," including the ISO Virus or Bacteria Endorsement attached to the All Risk Policy, all while representing falsely that the exclusions would not reduce coverage.

129.   The insurance industry wanted these new standard-form exclusions because previous exclusions relating to pollution or contamination made no reference to disease-related causes of loss—a fact the insurance industry became aware of during the Severe Acute Respiratory Syndrome (SARS) epidemic.  As a result, the insurance industry sought to exclude coverage for virus and disease-causing agents for the first time in 2006, while wrongly telling regulators and policyholders these causes of loss had never been covered anyway.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

130.   A close comparison of the ISO and AAIS filings and several individual insurance company filings reveals the insurance industry deceived the regulators as to the nature of the exclusions for which they sought approval, including the ISO Virus or Bacteria Endorsement, and proves that Mitsui wrongfully denied Madera's claim.

131.   The largest insurance industry trade group, ISO, led the way in the regulatory approval effort by submitting an ISO Circular to explain its newly proposed exclusion for viruses and disease-causing agents on July 6, 2006.

132.   ISO's Circular was filed in relation to the proposed Endorsement CP 01 40 07 06 - Exclusion Of Loss Due To Virus Or Bacteria—the same ISO Virus or Bacteria Endorsement now attached to the All Risk Policy.  The substance of the ISO Circular states as follows:

**Introduction**
The current pollution exclusion in property policies encompasses contamination (in fact, uses the term *contaminant* in addition to other terminology).  Although the pollution exclusion addresses contamination broadly, viral and bacterial contamination are specific types that appear to warrant particular attention at this point in time.
\*\*\*
Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property.  When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses.
**Current Concerns**
\*\*\*
**While property policies have not been a source of recovery for losses involving contamination by disease-causing agents, the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such policies may face claims in which there are efforts to expand coverage and to create sources of recovery for such losses, contrary to policy intent.**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

In light of these concerns, we are presenting an exclusion relating to contamination by disease-causing viruses or bacteria or other disease-causing microorganisms.

133.   It simply was not true for ISO to assert in 2006 that property insurance policies were not sources of recovery for policyholders that suffered losses involving disease-causing agents like virus, mold, or bacteria, and it was not true to assert these policies were never intended to be sources of recovery for these losses.

134.   AAIS went even further in filing its Virus or Bacteria Exclusion with state regulators, stating:

Virus Or Bacteria Exclusion - Filing Memorandum

AAIS has developed and is filing a mandatory endorsement for use with the Commercial Properties Program. This new mandatory Virus Or Bacteria Exclusion, CL 0700, is described below.

**<u>Property policies have not been, nor were they intended to be, a source of recovery for loss, cost, or expense caused by disease causing agents.</u>** With the possibility of a pandemic, there is concern that claims may result in efforts to expand coverage to create recovery for loss where no coverage was originally intended. In light of this possibility, AAIS is filing a Virus Or Bacteria Exclusion that will specifically address virus and bacteria exposures and clarify policy intent.

This endorsement clarifies that loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress is excluded.  Avian Flu, SARS, rotavirus, listeria, legionella, or anthrax are examples of disease or illness causing agents addressed by this exclusion but are by no means an exhaustive list.

A copy of CL 0700 10 06 is provided for your review. (emphasis added)

135.   Additionally, in response to an inquiry by the Delaware state insurance regulator, asking, "Does this filing result in any restriction of coverage?" AAIS responded "No."  Despite the prior existence of coverage for disease-causing agents discussed above, AAIS like ISO termed the new restriction a mere "clarification" of coverage.

136.   As individual insurance companies admitted in their own filings, and as ISO members admitted in internal meetings and correspondence, the existence of

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

coverage the ISO insurance companies were newly excluding had already been confirmed by the courts long before, and was part of the risks all property insurance companies previously contemplated when writing coverage, which policyholders reasonably expect and would never willingly part with.

137.  As noted above, by 2006, insurance companies were well aware their property insurance policies had been found to cover a variety of claims involving disease-causing agents.  The cases putting the industry "on notice" are legion and span decades, and involve E. coli bacteria, radioactive dust, noxious air particles, asbestos, mold, mildew, "health-threatening organisms," vaporized agricultural chemicals, pesticides, and other harmful physical conditions that impact property or make it unfit for use.

138.  Members of the insurance industry were contemporaneously aware that ISO's statements to state insurance regulators were false and that policyholders understand and expect coverage for losses that involve viruses impacting their operations.

139.  Internal ISO meeting minutes and correspondence leading up to ISO's false regulatory submissions, demonstrate that the insurance industry fully recognized that their regulatory filings were deceptive.  In fact, initial drafts of the ISO filings that led to the ISO Virus or Bacteria Endorsement being attached to Madera's All Risk Policy were intentionally altered to be *more* deceptive.

140.  ISO members recognized internally that commercial property and business income policies provide coverage for damaging impacts on insured property, even when property does not sustain visible damage, including impacts that do not change property's structural form or substance.  When considering liability for "pandemics" and "sub-microscopic property damage," ISO internally was "mulling over" the issue of "sub-microscopic" impacts on property, where damage has not "manifested" that is "visible to the naked eye" without "sophisticated scientific tests," recognizing that "[i]n some cases, the presence of a submicroscopic defect has been

– 40 –

enough to create liability."  Likewise, ISO was well aware that in the context of "collapse" coverage, there is "a long history of case law" that has often found coverage for "imminent collapse and loss of structural integrity", and not only collapse or damage that is visible.  *See* **Exhibit E**.

141.   In fact, Tom Gibboney, an ISO employee, admitted (internally) as early as September 28, 2005 at a Commercial Property Panel meeting, that an "insured would have a reasonable expectation of coverage if ordered to cease business by a government authority."   Likewise, Gibboney agreed with Madera's current position that governmental shutdown orders would suffice to demonstrate a covered loss to a business when "the public and its employees aren't allowed back in."  Where there is a closure order, ISO staff suggested, "I think we should assume there's a good reason for the order and honor it."

142.   The internal ISO-produced documents show that the insurance industry was aware it was being deceptive when telling state insurance regulators that virus exclusions introduced around 2006 were not material changes in coverage.  In fact, in a prior draft of an ISO contamination exclusion that would have included viruses within an exclusion for "contamination," ISO described the impact of its contamination exclusion referencing "virus" as: "**Impact: This change is a reduction in coverage**."

143.   This frank wording was quickly deleted and deceptively changed to its opposite, "**There is no change in coverage**," purportedly because "the existing Pollution exclusion is intended to encompass contamination."  As discussed above however, decades of court precedent and the industry's own records contradict this false statement, and instead demonstrate the virus exclusions introduced in 2006 and used by Mitsui in the All Risk Policy were material reductions in coverage.  Nevertheless, ISO on behalf of Mitsui went forward with its deceptive filings.

144.   A handful of individual insurance companies led by Greater New York Marine ("GNYM") subsequently filed requests to remove ISO's "virus" exclusions in New York.  GNYM, unlike Mitsui, truthfully explained to state insurance regulators in

its 2010 filings how ISO's prior representations about the new ISO endorsement were deceptive, namely: coverage for virus-caused property damage is created merely by **removing** ISO's exclusion. That is, "coverage [is] provided by omission of the exclusion. *See* **Exhibit F**.

145. In an Explanatory Memorandum, GNYM further explained to New York's insurance regulator that "pandemic" losses had long been anticipated in "Business Interruption/Time Element coverage segments."

146. GNYM noted that anticipated vectors for these types of losses involving insured property might include disease "transmitted to third parties via ingestion or some other direct contact to an insured's products," by a "Typhoid Mary," or even "spread through a HVAC system in any selected Apartment or Condo Building":

> The GNY Insurance Companies wishes to make this endorsement CP 01 78 Optional on individual risks rather than Mandatory on a panacea basis. **Because the GNY Insurance Companies is largely a niche market of habitational business, we feel that our exposure to this type of loss ("pandemic") is minimal, since such contagious disease is largely is transmitted to third parties via ingestion or some other direct contact to an insured's products. While it is possible that some type of disease (airborne Legionnaires Disease, for example) could spread through a HVAC system in any selected Apartment or Condo Building, it is highly unlikely that it would spread throughout a vast proportion of the apartments and condominiums across NYC that we insure.**

> While GNY does write some business in the restaurant classifications and **we acknowledge that some exposure is inherent in such classifications due to the "Typhoid Mary" or contagious disease hazard (as some saw in the Hepatitis B exposure via a green onion vector some years ago), we feel such exposure is minimal** since we do not write large concentrations of these risks in the same locales who could potentially use the same vendors of supplies. We do not write "chain" restaurants utilizing the same suppliers.

> For all of the above reasons, we believe application of this Exclusion is appropriate on occasion, only to certain individual risks which sell or distribute products to the public. Additionally, GNY's underwriting

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

management feels that **such an endorsement would be considered imposed on a restaurant account only if the risk presented with claim history indicative of recent incident and loss control with little remediation.**

147.   Moreover, GNYM justified its intention of selling coverage to restaurants and hotels without a virus or bacteria exclusion like ISO's by explaining this coverage was already widely expected by policyholders who would never voluntarily exclude it: no policyholders in the restaurant industry would "voluntarily request" the exclusion "because they feel that such an event is well within the realm of possible fortuitous occurrences and should be covered should such an event arise":

> Therefore, to answer your specific questions, **we do not anticipate that any of our insureds will voluntarily request this exclusion; some (habitational risks) because it would never enter their minds as a problem for which they would voluntarily reduce coverage; others (restaurants) because they feel that such an event is well within the realm of possible fortuitous occurrences and should be covered should such an event arise**.

> We anticipate that the Company will impose this exclusion on such individual risks that present with recent loss history of this type of claim and loss control that would give us concerns of an on-going nature (cavalier attitude of management regarding implementation of hand washing procedures by food handling staff); i.e., we would impose attachment of this Exclusion in accordance with prudent supportable underwriting analysis of risk (since the variables involved could be of substantial scope).  We do not anticipate imposing this exclusion on any specific classification (though restaurants are probably the most likely to experience such events) or across large segments of our book of business, since we do not feel the exposure to loss is very high in any segment of our existing Commercial Property book (though we acknowledge the possibility for Apartments, Condominiums and Office/Retail Buildings to experience such an event).

> **Because of the broad scope of the potential events which may occur, we feel that it is largely impossible to create a rule which takes in every aspect of exposure to communicable disease.**  Is it possible to simply indicate something in your proposed revision of our rule to state "This Exclusion will be applied on a case-by-case basis to risks which present

with recent loss history which in the underwriters judgment indicates a potential higher than average exposure to loss"?

**As indicated, our main object of this filing is to remove the carte blanch application of this Exclusion and not deny coverage to the majority portion of our book.**

148.   The insurance industry had motives to deceive insurance regulators on this point in New Jersey, California, and elsewhere in 2006, just as it did when similar deceptions were made in 1970 and 1985:  the insurance industry wanted to exclude an existing exposure that policyholders widely expected without critical attention being paid by regulators – the only persons who can negotiate meaningfully with insurance companies about standard-form policy language – and the insurance companies also wanted to avoid an enforced reduction in premiums or rates.

149.   In fact, GNYM expressly noted that it had no need to charge an increased premium rate to provide coverage for virus-caused losses by merely removing the ISO Virus or Bacteria Endorsement, because ISO had successfully prevailed in convincing the state insurance regulators to approve the ISO Virus or Bacteria Endorsement for use in policies like the All Risk Policy without requiring any premium "give back" to policyholders.

150.   As a result of ISO, AAIS, and other insurers' deception and misrepresentations, the New Jersey and California state insurance regulators approved the ISO Virus and Bacteria Endorsement for use in commercial property and business income policies, and the ISO Virus or Bacteria Endorsement was attached to the All Risk Policy issued to Madera.

151.   The insurance industry, including Mitsui, benefited from their misrepresentations and omissions to the state insurance regulators about the ISO Virus or Bacteria Endorsement, including the New Jersey Banking and Insurance Commissioner and the California Insurance Commissioner, by improperly maintaining pre-existing premiums for what the insurance industry and Mitsui now contend was

substantially reduced property and business income insurance coverage from what previously existed. Indeed, in both New Jersey and California, the insurance industry was permitted to add the ISO Virus or Bacteria Endorsement to existing property and business income insurance policies with no rebate in premium or rate alteration.

152. The insurance industry, including Mitsui, made such representations in order to induce state regulators, including in New Jersey and California, to approve the ISO Virus or Bacteria Endorsement and to allow the insurance companies to continue to charge the same level of premiums. Upon information and belief, Mitsui, and/or its agents, has repudiated representations made in regulatory filings with New Jersey, California, and other states, and failed to warn Madera that it was repudiating such representations.

153. Although Mitsui now contends that the ISO Virus or Bacteria Endorsement does not involve a significant decrease in coverage, its representatives at ISO took contrary positions and succeeded in reducing coverage without any premium reduction or appropriate scrutiny.

154. Once the exclusions proposed by ISO and AAIS gained regulatory approval, they were uniformly adopted as an endorsement to innumerable commercial property insurance policies.

**E. Mitsui's Duties Under the All Risk Policy and California Law.**

**1.      Duties Under the All Risk Policy.**

155. As a result of the United States government and public health system's failure to contain the spread of the COVID-19 pandemic, or the civil authority orders restricting and/or barring access to Madera's businesses and properties, Mitsui is obligated by the All Risk Policy to pay for direct physical loss of or damage to and all Business Income loss and Extra Expense incurred at the premises described in the Schedule of Locations and Endorsements attached to the All Risk Policy, including those expenses that would not have been incurred if there had been no direct loss or

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

damage to covered property; expenses to avoid or minimize the suspension of business and to continue operations at the described premises, replacement premises, or temporary locations, or to minimize the suspension of business where operations could not continue; and extra expenses to repair or replace property, and to pay various Additional Coverages, including Civil Authority, Extended Business Income, and Dependent Properties – Miscellaneous Locations.

156.   In addition to these covered causes of loss, the presence or suspected presence of the virus or the ubiquitous presence of the virus throughout the states where Madera's covered restaurants are located was another link in the chain of causation resulting in the direct physical loss of or damage to Madera's insured locations.  Virus was not, however, the predominant cause of loss, and these other covered causes of loss were independently sufficient to trigger coverage under the All Risk Policy, including for Business Income, Extra Expense, Civil Authority, and Dependent Properties – Miscellaneous Locations.

157.   Each of these covered causes of loss has resulted in direct physical loss of or damage to Madera's restaurants because the restaurants are unusable for their intended purpose or unsafe for normal human occupancy or continued use.  Madera has lost the functionality of those premises and has lost their economic utility.   The restaurants are intended to be used as dine-in facilities, bars, catering facilities, and event spaces.

158.   Due to these covered causes of loss, Madera's restaurants were no longer able to serve their intended use, have suffered direct physical loss of or damage, and have sustained a necessary suspension of their operations, regardless of whether any virus was present or detected at any Madera restaurant.

159.   As a result of the foregoing, Mitsui is obligated to pay for direct physical loss of or damage to the premises described in the Schedule of Locations and Endorsements attached to the All Risk Policy, and all Business Income loss and Extra Expense incurred, including those expenses that would not have been incurred if there

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

had been no direct physical loss of or damage to covered property; expenses to avoid or minimize the suspension of business and to continue operations at the described premises, replacement premises, or temporary locations, or to minimize the suspension of business where operations could not continue; and extra expenses to repair or replace property, and to pay all Additional Coverages, including Civil Authority, Extended Business Income, and Dependent Properties – Miscellaneous Locations.

160.    The closure of Madera's restaurants served to mitigate further loss.

### 2.    Obligations Imposed By California Law.

161.    Mitsui and the insurance industry at large have denied coverage to policyholders for pandemic-related business income claims throughout the country because they have determined that doing so furthers their economic interests.

162.    These unfair practices by Mitsui and other carriers reached a crescendo in April 2020, prompting the California Insurance Commissioner and Department of Insurance to issue a Notice on April 14, 2020 to all admitted and non-admitted insurance companies.  Issued after receiving numerous complaints from California businesses, the Notice admonished insurance companies' refusal to investigate business interruption claims and reminded insurers of their obligation under California law to "fairly investigate" all such claims.  Insurance Commissioner Ricardo Lara echoed the Notice's mandate in an associated press release:  "I want to be absolutely clear that insurance companies need to fairly investigate all business interruption claims as they would during any disaster."

163.    California state insurance law requires that insurance companies act in good faith, abstain from deception, and practice honesty and equity in all insurance matters.  In the State of California, the business of insurance is affected by the public interest and engaging in the business of insurance requires insurance companies like Mitsui to promptly conduct fair, balanced, and thorough investigations of all bases of claims for benefits made by their policyholders, with a view toward honoring the claims.  As part of these obligations, an insurance company is obligated to diligently search for

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

and consider evidence that supports coverage of the claimed loss, and in doing so must give at least as much consideration to the interests of its insured as it gives to its own interests.

164.   Mitsui has a duty to adopt and maintain a consistent and rational interpretation of the All Risk Policy sold to Madera.

165.   Mitsui is bound to investigate Madera's claim in good faith and with an individualized investigation into the causes of loss.

166.   If a policyholder's understanding of its insurance coverage has been induced by misrepresentations by the insurance company, then the insurance policy should be reformed to reflect the terms as represented by the insurance company.

167.   If insurance companies induce a state insurance regulator to approve an exclusion through misrepresentations, then insurance companies should be estopped from enforcing the exclusion.

168.   Mitsui has failed to honor its obligations under the All Risk Policy and governing law to Madera.  As described in greater detail below, Mitsui summarily denied all coverage and breached (a) the All Risk Policy sold to Madera and (b) the duties of good faith and fair dealing owed to Madera.  These breaches have caused great and incalculable damages to Madera.  Mitsui has threatened to violate and has violated its fiduciary duties to Madera.

169.   By engaging in evasive, dilatory, inconsistent, and litigious tactics, Mitsui breached its obligation to act in good faith towards its policyholders, including Madera, and the public.

## XI.   MITSUI'S IMPROPER DENIAL OF MADERA'S CLAIM

170.   Madera promptly notified Mitsui of its claim for losses under the All Risk Policy.

171.   In its April 6, 2020 denial letter, issued just weeks after notice was provided, Mitsui contended Madera did not sustain "direct physical loss of or damage

to property" at insured premises that is "caused by or results from a Covered Cause of Loss," defined as "direct physical loss unless the loss is excluded or limited in this policy."

172.   In its April 6, 2020 denial letter, Mitsui asserted that the ISO Virus or Bacteria Endorsement excludes coverage for Madera's claim.

173.   Mitsui further contended that coverage for "Business Income" during a necessary suspension of operations is not triggered because "it does not appear that COVID-19 caused 'direct physical loss of or damage to' insured property."

174.   Mitsui also denied coverage for interruption caused by orders of "Civil Authority," because "it does not appear that a covered cause of loss caused 'damage to property' within one mile of the insured premises."

175.   Given the timing of the denial, no investigation into the claim was conducted at all.  Consequently, by failing to raise any other bases for denial of coverage in its premature denial letter, Mitsui waived any additional grounds to contest Madera's claim under California law.

176.   At no time subsequent to Madera providing notice to Mitsui of the claim has Mitsui, or its representatives, requested information or documentation related to the claim; or to access, inspect, and/or test the properties at issue.

177.   Madera has substantially performed or otherwise satisfied all conditions precedent to bringing this action and obtaining coverage pursuant to the All Risk Policy and applicable law, or alternatively, Madera has been excused from performance by Mitsui's acts, representations, conduct, or omissions.

## FIRST CAUSE OF ACTION

### (For Declaratory Relief Against Mitsui)

178.   Madera incorporates by reference the allegations contained in paragraphs 1-177.

179.   As set forth above, Mitsui sold Madera the All Risk Policy protecting against direct physical loss of or damage to property, Business Income loss, and Extra

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Expense, among other losses, costs, and expenses now being suffered by Madera because of the United States government and public health system's failure to contain the spread of the COVID-19 pandemic, closure orders, and/or the presence or suspected presence of the virus or the ubiquitous presence of the virus throughout the states where Madera's covered restaurants are located.

180. Mitsui breached and continues to breach its promises, as set forth in the All Risk Policy, by failing and/or refusing to honor its promises to pay for direct physical loss of or damage to property, Business Income loss, and Extra Expense, among other losses, costs, and expenses now being suffered by Madera due to the United States government and public health system's failure to contain the spread of the COVID-19 pandemic, various closure orders, and/or the presence or suspected presence of the virus or the ubiquitous presence of the virus throughout the states where Madera's covered restaurants are located.

181. As a direct and proximate result of Mitsui's breaches of contract and refusal to acknowledge its coverage obligations, Madera has suffered and will continue to suffer serious harm in an amount in excess of $15,000,000.

182. An actual and justiciable controversy exists between Madera and Mitsui regarding the interpretation, application, and meaning of the All Risk Policy.

183. Accordingly, Madera is entitled to declaratory judgment of this Court of its rights and of the obligations of Mitsui under the All Risk Policy.

184. Declaratory relief from this Court will resolve all outstanding issues between Madera and Mitsui under the All Risk Policy.

WHEREFORE, pursuant to 28 United States Code §§ 2201 and 2202, Madera seeks judgment in its favor as to Count I as follows:

a. The entry of an Order declaring that the United States government and public health system's failure to contain the spread of the COVID-19 pandemic caused "direct physical loss of or damage" to property, within the meaning of that phrase as used in the All Risk

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Policy, sufficient to trigger coverage under the All Risk Policy, including in relation to Business Income loss, Extra Expense, and Additional Coverages, including Civil Authority, Extended Business Income, and Dependent Properties – Miscellaneous Locations;

b.   The entry of an Order declaring that the closure orders described above caused "direct physical loss of or damage" to property, within the meaning of that phrase as used in the All Risk Policy, sufficient to trigger coverage under the All Risk Policy, including in relation to Business Income loss, Extra Expense, and Additional Coverages, including Civil Authority, Extended Business Income, and Dependent Properties – Miscellaneous Locations;

c.   The entry of an Order declaring: (i) the ISO Virus or Bacteria Endorsement is invalid and unenforceable, and Mitsui is estopped from relying upon or seeking to enforce its terms; and (ii) the presence or suspected presence of the virus or the ubiquitous presence of the virus throughout the states where Madera's covered restaurants are located causes "direct physical loss or damage" to property sufficient to trigger coverage under the All Risk Policy for Madera's associated losses, including in relation to Business Income loss, Extra Expense, and Additional Coverages, including Civil Authority, Extended Business Income, and Dependent Properties – Miscellaneous Locations;

d.   The entry of an Order declaring Mitsui must pay Madera up to the limits of liability for direct loss of or damage to Covered Property, Business Income loss, Extra Expense, and Additional Coverages, including Civil Authority, Extended Business Income, and Dependent Properties – Miscellaneous Locations; and

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

e.   The award of such additional relief as the Court deems just and appropriate.

## SECOND CAUSE OF ACTION

### (Damages For Breach of Contract Against Mitsui)

185.   Madera incorporates by reference the allegations contained in paragraphs 1-184.

186.   Madera has incurred, and will incur in the future, Business Income loss, Extra Expense, and other covered loss, damage, cost, and expense, including investigation and loss mitigation costs, because of a covered cause of loss – the United States government and public health system's failure to contain the spread of the COVID-19 pandemic, closure orders, and/or the presence or suspected presence of the virus or the ubiquitous presence of the virus throughout the states where Madera's covered restaurants are located.

187.   In addition, Mitsui has asserted its reliance on the ISO Virus or Bacteria Endorsement, contrary to its and the insurance industry's position with state insurance regulators that virus exclusions were a clarification rather than a new restriction on coverage. This changed interpretation wrongfully asserted by Mitsui should be estopped, and the initial interpretation that no change in coverage was being made should be enforced.

188.   In breach of the All Risk Policy, Mitsui refused or otherwise failed to recognize any coverage afforded for Madera's losses and reimburse Madera for the losses suffered to date, thereby causing damage to Madera.

WHEREFORE, Madera seeks judgment in its favor as to Count II as follows:

a.   The entry of an award requiring Mitsui to pay Madera all monetary damages suffered by Madera caused by Mitsui's breaches, including, without limitation, compensatory damages,

consequential damages, pre-judgment interest, post-judgment interest, attorneys' fees, and costs; and

b.   The award of such additional relief as the Court deems just and appropriate.

### THIRD CAUSE OF ACTION

### (Regulatory Estoppel Against Mitsui)

189.   Madera incorporates by reference the allegations contained in paragraphs 1-188.

190.   To the extent the ISO Virus or Bacteria Endorsement may apply to Madera's losses, Mitsui as a New Jersey insurance company should be estopped from relying upon that exclusion under New Jersey common law, including the public policy it embodies.

191.   The statements by ISO and AAIS as the agents for the insurance industry, including Mitsui, to New Jersey's state insurance regulator concerning the ISO Virus or Bacteria Endorsement were untrue and came perilously close to deception.

192.   Contrary to ISO's and AAIS's false statements, property policies have traditionally been a source of recovery for losses involving disease-causing agents, and the new ISO Virus or Bacteria Endorsement proposed by ISO represented a significant reduction in coverage from what was previously available.

193.   The industry's presentation and characterization of the ISO Virus and Bacteria Endorsement to state regulators constituted the only opportunity for arms-length bargaining by interests adverse to the industry, policyholders having virtually no choice at all but to purchase the industry-wide standard property policy after it was approved based on false and misleading representations by Mitsui's agents to state insurance regulators, including in Mitsui's home state of New Jersey.

194.   The ISO Virus or Bacteria Endorsement should be construed in a manner consistent with the representations made by ISO and AAIS to the New Jersey and other state regulatory authorities, because only those regulatory authorities were presented

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

– 53 –

with an opportunity to disapprove the clause.  More specifically, the ISO Virus or Bacteria Endorsement should not be interpreted as restricting coverage beyond the coverage that was previously available at the time the exclusion was introduced in 2006.

195.   A limited interpretation of the ISO Virus or Bacteria Endorsement as applied to a New Jersey insurance company like Mitsui is appropriate because, as discussed in *Morton International*, permitting a more expansive interpretation "would contravene this State's public policy requiring regulatory approval of standard industry-wide policy forms to assure fairness in rates and in policy content, and would condone the industry's misrepresentation to regulators in New Jersey and other states concerning the effect of the clause."  *Morton Int'l*, 629 A.2d at 848.

196.   New Jersey has a greater interest in preventing bad faith and deceptive conduct by New Jersey insurance companies like Mitsui that do business with policyholders in other states, such as Madera.

197.   Because Mitsui has asserted its reliance on the ISO Virus or Bacteria Endorsement and declined to repudiate the false statements made by ISO and AAIS that the exclusion was not a new restriction on coverage, Mitsui must be estopped from seeking to enforce the ISO Virus or Bacteria Endorsement to whatever extent it may apply to Madera's losses, which Madera denies.  Instead, the Court should enforce ISO and Mitsui's public statements that no change in coverage was being made by addition of the exclusion.

WHEREFORE, Madera seeks judgment in its favor as to Count III as follows:

      a.    The entry of an award declaring that Mitsui may not purport to rely on the ISO Virus or Bacteria Endorsement to oppose Madera's claims to the extent the endorsement restricts coverage that was previously available under property insurance policies like the All Risk Policy; and

      b.    The award of such additional relief as the Court deems just and appropriate.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  Dated: July 16, 2021                    REED SMITH LLP

2

3                                          By:    */s/ Ashley B. Jordan*

4                                              Ashley B. Jordan
                                               John N. Ellison
5                                              Luke E. Debevec

6                                              Attorneys for Plaintiff
                                               The Madera Group, LLC
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT

## DEMAND FOR JURY TRIAL

The Plaintiff demands a trial by jury on all issues so triable.

Dated: July 16, 2021                    REED SMITH LLP


By:   */s/ Ashley B. Jordan*

Ashley B. Jordan
John N. Ellison
Luke E. Debevec

Attorneys for Plaintiff
The Madera Group, LLC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## PROOF OF SERVICE

*The Madera Group v. Mitsui Sumitomo Insurance USA Inc.,*
LASC Case No.: 20SMCV00895

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is REED SMITH LLP, 355 South Grand Avenue, Suite 2900, Los Angeles, California 90071-1514. On July 16, 2021, I caused to be served the following document(s) by the method indicated below:

**AMENDED COMPLAINT FOR: 1) DECLARATORY JUDGMENT; 2) BREACH OF CONTRACT; 3) REGULATORY ESTOPPEL, AND DEMAND FOR JURY TRIAL**

☑   **By Electronic Filing** (I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel denoted on the attached Service List.

☐   by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below. I am readily familiar with the firm's practice of collection and processing of correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in this Declaration.

☐   by placing the document(s) listed above in a sealed envelope(s) and by causing personal delivery of the envelope(s) to the person(s) at the address(es) set forth below. A signed proof of service by the process server or delivery service will be filed shortly.

☐   by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☐   by placing the document(s) listed above in a sealed envelope(s) and consigning it to an express mail service for guaranteed delivery on the next business day following the date of consignment to the address(es) set forth below. A copy of the consignment slip is attached to this proof of service.

☐   by transmitting via email to the parties at the email addresses listed below:

Dated:   July 16, 2021                                    */s/ Ashley B. Jordan*

– 57 –
PROOF OF SERVICE

**SERVICE LIST**
The Madera Group, LLC v. Mitsui Sumitomo Insurance USA Inc.
No. 2:20-cv-07132-JAK-AFM

**Counsel for Defendant**

Maura C. Smith
Brian E. O'Donnell
Jeffrey M. Beyer
Riker Danzig Scherer Hyland and Perretti LLP
One Speedwell Avenue
Morristown, NJ 07962-1981
973-451-8481
973-451-8681 (fax)
msmith@riker.com
bodonnell@riker.com
jbeyer@riker.com

Erin E. McCracken
Sullivan and Triggs LLP
1230 Montana Avenue Suite 201
Santa Monica, CA 90403
310-451-8300
310-451-8303 (fax)
eem@bergerhipskind.com

Kristopher S. Davis
Faegre Drinker Biddle and Reath LLP
1800 Century Park East Suite 1500
Los Angeles, CA 90067-1517
310-203-4000
310-229-1285 (fax)
kristopher.davis@faegredrinker.com

REED SMITH LLP
A limited liability partnership formed in the State of Delaware